**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | | |
|---|---|---|---|
| NORTHERN ILLINOIS TELECOM, INC., | ) | | |
| | ) | | |
| Plaintiff, | ) | Case No. 12 C 2372 | |
| | ) | | |
| v. | ) | | |
| | ) | Judge John Robert Blakey | |
| PNC BANK, NA, | ) | | |
| | ) | | |
| Defendant. | ) | | |
| | ) | | |

## MEMORANDUM OPINION AND ORDER

Northern Illinois Telecom, Inc. ("NITEL") sued PNC Bank NA ("PNC") for breach of contract [46-2]. On PNC's motion [44], the Court entered summary judgment in favor of PNC, finding that NITEL had failed to demonstrate the existence of a valid contract between the parties [63]. PNC then moved for sanctions under Federal Rule of Civil Procedure 11, arguing that NITEL knew or should have known that its claim was frivolous from the outset and that NITEL sued PNC for an improper purpose – namely, to harass and exploit a settlement [65]. For the reasons set forth below, PNC's motion is granted.

### Background & Procedural History

NITEL filed a breach of contract suit against PNC in Cook County Circuit Court, alleging that PNC failed to pay for cabling work NITEL had done at four bank branches. *See* Verified Complaint [46-2]. NITEL alleged that:

> [i]n August of 2007, NITEL entered into agreements with National
> City Bank and Mid-America Bank to install data and telephone cabling
> at four separate bank locations:
>
> A.  90 Burr Ridge Parkway, Burr Ridge, Illinois;
> B.  2600 E. Main Street, St. Charles, Illinois;
> C.  8990 N. Milwaukee Avenue, Niles, Illinois; and
> D.  1955 N. Damen Avenue, Chicago, Illinois.

Verified Complaint [46-2], ¶4. NITEL alleged that it performed the work required under "Work Orders" signed by bank representatives at each location; that it issued invoices on those work orders; and that National City Bank and Mid-America Bank defaulted on their obligations under the agreement[1] by failing to pay NITEL for the work it completed at those four locations. *Id.*, ¶¶6, 8-9. NITEL alleged that PNC, as "the successor in interest to both National City Bank and Mid-America Bank . . . is solely responsible for the obligations of those entities" – including damages of $81,300 "based on the fact that the banks never paid for any of the work performed under those invoices." *Id.*, ¶¶10-11.

PNC removed the action to the Northern District of Illinois [1] and answered the complaint, denying the existence of any agreement between NITEL and PNC or its predecessor banks and denying any obligation to pay. PNC's Answer and Affirmative Defenses [7], ¶¶4, 9, 13. PNC asserted that NITEL was a subcontractor to Nexxtworks Inc., and that any monies due and owing to NITEL were owed by Nexxtworks. *Id.*, ¶14.

Before engaging in substantial discovery, PNC sent NITEL a letter detailing the defects in the claim against PNC. On July 31, 2012, Jim Crowley, counsel for

---

[1] The complaint refers to "agreements" in ¶4, "agreement" in ¶9, and seems to use these words, as well as "work orders" and "invoices" interchangeably.

PNC, wrote to Robert Riffner, counsel for NITEL, advising that PNC was taking the position that neither it, nor its predecessors, ever entered into an agreement with NITEL relating to the matters referenced in NITEL's complaint. *See* 7/31/12 Letter from Crowley to Riffner [65-1] (attached as Exhibit A to PNC's motion for sanctions). PNC asserted that NITEL performed the subject work as a subcontractor to Nexxtworks and that if it believed it was owed money, it should look to Nexxtworks. *Id.,* p. 1. According to Crowley, NITEL knew its claim was with Nexxtworks, not PNC, and NITEL's awareness of the real party in interest was obvious as of at least February 16, 2010, when NITEL filed a proof of claim in Nexxtworks' bankruptcy case. *Id.* Crowley attached the proof of claim and, based upon the information and evidence, demanded that NITEL dismiss the complaint or risk sanctions under Rule 11. *Id.* Crowley advised that if NITEL did not dismiss the complaint, "PNC will be seeking sanctions under Federal Rule 11 against NITEL and your firm in connection with the matters which are set forth in the referenced Complaint." *Id.,* p. 2. PNC offered to settle the matter in exchange for a dismissal order and a check to cover PNC's attorney's fees and costs in defending against the lawsuit to date (which, at that time, amounted to about $9,000). NITEL did not respond (through counsel or otherwise), and PNC was forced to proceed with discovery.

During discovery, PNC reiterated that it could not be liable to NITEL because NITEL never had an agreement with PNC or its predecessor banks. In fact, when NITEL objected to PNC's discovery requests as irrelevant, PNC moved to

compel. *See, e.g.,* PNC's Motion to Compel [24], ¶¶1-3. At the hearing on the motion, the subject of proof came up, and the Magistrate Judge expressly discussed the fact that, absent a contract, PNC could not be found liable on NITEL's breach of contract claim, even if NITEL had done the work. *See* Transcript of Proceedings from 2/28/13 [93], pp. 15-16, 19-20 (attached as Exhibit H to PNC's Reply in Support of its Motion for Sanctions). The Magistrate Judge specifically disabused counsel of any notion that an email from Nexxtworks telling NITEL to deal directly with the banks could somehow form the basis of a breach of contract claim against PNC and that the work orders signed by bank managers likewise would not establish a contract between PNC and NITEL either. *Id.*, pp. 15-16, 19-20. The Magistrate Judge further noted that NITEL's filing of a proof of claim in Nexxtworks' bankruptcy case, however, "does indicate that [NITEL] believed that they were the people who owed him money" and that in terms of establishing a legal obligation to pay on the part of PNC, NITEL had "real proof problems"; she observed that the mere fact that he did not get paid "doesn't mean that he can be made whole by [PNC]." *Id.*, pp. 26, 30, 40.

These points were reiterated in the order entered following the hearing: "NITEL asserts that 'PNC needs to provide evidence they have either previously paid NITEL . . ., or . . . that they have paid Nexxtworks for the cabling services performed. Dkt. 27-7. This assertion turns the burden of proof on its head. NITEL has the burden of proving the monies it seeks to collect are due and owing from PNC." Order dated 3/6/13 [39], p. 3, n.1.

Shortly after this hearing, PNC sent NITEL a second Rule 11 letter. On April 2, 2013, Crowley wrote to Riffner, reiterating PNC's earlier position and refuting NITEL's allegations concerning the existence of a contract. *See* April 2, 2013 Letter from Crowley to Riffner [65-5] (attached as Exhibit E to PNC's motion for sanctions). Crowley attached documents, including affidavits from the bank representatives who allegedly signed the work orders NITEL claimed formed the basis of a contractual relationship between NITEL and PNC. According to the affidavits, which came from the managers of the four branches where work was done, the individuals represented were not authorized to sign such orders, the individuals denied signing the orders and further represented that the signatures appeared to be forged. *Id.* Crowley's second letter advised NITEL that PNC planned to file a motion for summary judgment based upon the lack of any contractual obligation on PNC's part. Crowley advised that PNC would also file "a motion for sanctions against your client, as well as your office with respect to this frivolous lawsuit and you, as attorney for NITEL, should have either refused to file this lawsuit, or sought settlement once you became aware of the matters which I describe above." *Id.*, p. 3. PNC again offered to settle the matter in exchange for a dismissal order and a check to cover fees and costs (which, by this point, exceeded $24,000 after a discount). NITEL did not respond to the letter (through counsel or otherwise).

Subsequently, PNC deposed Paul Coy, NITEL's President, on May 9, 2013. Coy's deposition testimony shows that NITEL's breach of contract claim was based

on work orders and a general desire to make someone pay for the services NITEL provided. In fact, Paul Coy admitted at his deposition that he did not know (or particular care) whether NITEL had a contract with PNC. When asked why he was suing PNC, Coy testified that

> [i]t depends on who paid who for the job. If the banks never – if the banks paid Nexxtworks for the job and Nexxtworks didn't pay us, then we would have to go after Nexxtworks for the job. But if the banks never paid Nexxtworks for the job and were supposed to pay us, then we are owed the money from the banks. We're just trying to find the money.

Coy Deposition [83], p. 67, lines 16-23. When pressed, he testified:

> I don't know the legalities of it. I'm speculating. My opinion of the matter is that if National City – even if National City paid Nexxtworks for the job, we still then did not get paid for the services. Therefore, National City reaped the benefits of our services and should be paying us for our services.
> Q: Even if they paid Nexxtworks?
> A: Yes.

Coy Deposition [83], p. 68, lines 15-23. When asked why he was seeking payment from Nexxtworks, he testified: "[b]ecause we didn't know who the bank had paid. So we were trying to go after anybody that had money. We just didn't want to [lose] any opportunities." *Id.*, p. 111, lines 19-21. Riffner represented Coy at his deposition.

On September 9, 2013, PNC moved for summary judgment [44]. Judge St. Eve, to whom the case was previously assigned, found that NITEL could not establish the existence of a valid contract between it and PNC or its predecessors and that PNC was therefore entitled to judgment as a matter of law. Memorandum

Opinion and Order [63], pp. 12-14. The Court granted PNC's motion for summary judgment on August 27, 2014, and judgment was entered that same day [64].

About two months later, on October 21, 2014, PNC filed a motion seeking sanctions under Federal Rule of Civil Procedure 11 [65]. In its motion, PNC argues that NITEL's claim against it has been baseless from the start and that sanctions are therefore appropriate. PNC asks this Court to require NITEL to pay the attorney's fees and costs PNC incurred in defending against this frivolous claim (a total of about $84,000). *See* Motion for Rule 11 Sanctions [65]; Supplemental Affidavit in Support of Attorneys' Fees and Costs [87]; Second Supplemental Affidavit in Support of Attorneys' Fees and Costs [94].

In response, NITEL continued to litigate against PNC by opposing the sanctions motion on timeliness grounds, and moving to dismiss it. Motion to Dismiss [71]. PNC moved to strike the motion to dismiss. Motion to Strike [76]. The Court denied both motions, set PNC's sanctions motion for a hearing on January 29, 2105, and directed NITEL to file a substantive response to the sanctions motion by January 23, 2015. *See* Order entered 1/9/15 [80]. When NITEL failed to file a response as directed, the Court ordered the parties to appear on January 29 and to address the merits of the motion. Order entered 1/26/15 [81]. Counsel for NITEL failed to appear on January 29, 2015 as directed, and the attorney who stepped up on his behalf had not filed an appearance in the case and was not prepared to argue the merits of the sanctions motion. The Court reset the matter for hearing on March 3, 2015, and directed NITEL to file a substantive

response to PNC's sanctions motion by February 26, 2015. *See* Order entered 1/29/15 [82]. NITEL filed its response on February 27 [91]. PNC filed a timely reply [93], along with a supplemental affidavit in support of its claimed attorneys' fees and costs [94].

Discussion

Federal Rule of Civil Procedure 11 provides that a court may "impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Fed. R. Civ. P. 11(c). Subdivision (b) of Rule 11 provides that:

> [b]y presenting to the court a pleading, written motion, or other paper -- whether by signing, filing, submitting, or later advocating it -- an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1)     it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2)     the claims, defenses and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3)     the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4)     the denial of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). PNC argues that NITEL and its attorneys have violated subsections (1), (2) and (3).

A.     <u>PNC's Motion is Procedurally Appropriate.</u>

Initially, PNC's motion is timely.  "It is well established in this Circuit that 90 days from the date of entry of final judgment represents 'the outer parameters of the timeliness for sanctions claims.'" *Sullivan v. Hunt*, 350 F.3d 664, 666 (7th Cir. 2003) (quoting *Kaplan v. Zenner*, 956 F.2d 149, 151 (7th Cir.1992). "Moreover, 90 days from the entry of final judgment is not guaranteed to the parties; we have held that this limit 'will not necessarily protect a sanctions claim if the party bringing it has failed to do so within a reasonable amount of time.'" *Sullivan*, 350 F.3d at 666 (quoting *Kaplan*, 956 F.2d at 152). "Where appropriate, sanctions motions 'should be filed at an earlier time-as soon as practicable after discovery of a Rule 11 violation.'" *Sullivan*, 350 F.3d at 666 (quoting *Kaplan*, 956 F.2d at 151).

PNC advised NITEL via letters dated July 31, 2012 and April 2, 2013 that NITEL's claims against PNC were frivolous.  When NITEL refused to stand down, PNC was forced to defend itself against the lawsuit and to pursue and participate in discovery to build its case for summary judgment.  Once summary judgment was entered, PNC moved with reasonable speed to prepare and file its motion.  NITEL can hardly argue that it had no notice that a Rule 11 motion would be forthcoming.

In *Olson v. Reynolds*, No. 11-2273, 2012 WL 2403519 (7th Cir. June 27, 2012), the Seventh Circuit found untimely a Rule 11 motion that was not served on the opposing party until after trial was over and after the defendant had spent a lot of time and money defending against the frivolous allegations.  In *Olson*, however, the Court also noted that the time and expense could have been avoided if the

defendant had served the Rule 11 motion earlier and given the plaintiff a chance to retract the filings. Here, PNC gave NITEL that chance – in fact, PNC gave NITEL two explicit chances. Nevertheless, NITEL chose to pursue its claim in bad faith. It cannot now claim surprise that PNC is following through on its threat to pursue Rule 11 sanctions.

Additionally, the Seventh Circuit has noted that, in some cases, technical compliance with the safe harbor provision may not be possible and substantial compliance may be enough. *E.g., Methode Electronics, Inc. v. Adam Technologies, Inc.*, 371 F.3d 923, 927 (7th Cir. 2004). Here, PNC fired two warning shots – which is what the Advisory Committee Notes suggest. NITEL chose not to respond and failed to abandon its baseless claim. And once judgment was entered, there was nothing left for NITEL to retract and no need for NITEL to be given another opportunity to take advantage of any safe harbor provision. *See also Matriz IV, Inc. v. American National Bank and Trust Co. of Chicago*, 649 F.3d 539, 552-553 (7th Cir. 2011) ("Postjudgment motions for sanctions are permissible so long as the moving party substantially complies with Rule 11's safe harbor requirement" and "a letter informing the opposing party of the intent to seek sanctions and the basis for the imposition of sanctions" – as long as it is sent at least 21 days before the motion for sanctions is filed – "is sufficient for Rule 11 purposes."). PNC's motion is timely and procedurally proper.

B.    <u>Sanctions Under Rule 11 are Warranted.</u>

PNC argues that NITEL and its attorney, Robert Riffner, violated Rule 11 by filing a complaint and pursuing a claim they knew was frivolous. PNC also argues that NITEL and Riffner pursued the claim for an improper purpose – namely, to harass PNC for the purpose of extorting a settlement.

The decision to award sanctions under Rule 11 is within the Court's discretion. *E.g., de Silva v. Cinquegrani*, No. 11 C 4259, 2014 WL 3954990, at *2 (N.D. Ill. Aug. 13, 2014) (citing *Cooney v. Casady*, 735 F.3d 514, 523 (7th Cir. 2013)). Sanctions should be "granted sparingly . . . and should not be imposed lightly.'" *de Silva*, 2014 WL 3954990, at *2 (quoting *Lefkovitz v. Wagner*, 219 F.R.D. 592, 593 (N.D. Ill. 2004)). Nevertheless, such sanctions "may be imposed on a party for 'making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose.'" *Ochs v. Hindman*, 984 F.Supp.2d 903, 912 (N.D. Ill. 2013)(quoting *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir. 1998)). "A frivolous argument or claim is one that is 'baseless and made without a reasonable and competent inquiry.'" *Id.* (quoting *Fries*, 146 F.3d at 458).

The mere fact that NITEL lost on summary judgment does not, by itself, mean that its claim was frivolous or that it should automatically be sanctioned. *E.g., Cartwright v. Cooney*, 788 F.Supp.2d 744, 755 (N.D. Ill. 2011) ("even when a court has ruled that a party has been "wrong on the law," sanctions against that party do not flow inevitably") (citing *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Financial Servs., Inc.*, 9 F.3d 1263, 1270 (7th Cir. 1993)). "The test is

whether 'competent attorneys performing a reasonable investigation could not have believed in the merit of the position taken in the complaint . . . .'" *Cartwright*, 788 F.Supp.2d at 756 (quoting *Harlyn Sales*, 9 F.3d at 1269).

Based upon the record (and confirmed by Judge St. Eve's findings in ruling on the motion for summary judgment), NITEL's claims were baseless from the start. NITEL sued PNC for breach of contract, seeking to impose liability under the theory that PNC was the successor-in-interest to National City Bank, which in turn was the successor-in-interest to MidAmerica Bank, FSB. NITEL alleged in its complaint that it entered into contracts with National City and MidAmerica to do cabling work at four Chicago-area branches; that it completed the work required under the contacts; that a representative of either National City or MidAmerica signed off on the work at each branch; yet neither bank paid the invoices when NITEL presented them for payment.

In fact, however, NITEL never had contracts with National City, MidAmerica or PNC. Rather, the work referenced in the complaint was performed pursuant to contracts between the banks (National City and MidAmerica) and Nexxtworks, Inc.; Nexxtworks then entered into a written subcontract with NITEL to perform some of the work, including the work done at the four branches referenced in the complaint. NITEL invoiced Nexxtworks for the work and Nexxtworks paid the invoices (though it withheld certain amounts because of issues with the quality of the work that are not relevant to the current discussion). Nexxtworks then invoiced National City and National City paid Nexxtworks' invoices in full.

In light of the above, the allegations in the Verified Complaint lack any basis in law or fact. Although the Verified Complaint was not filed in federal court (it was removed), the false allegations have been improperly pursued and persistently presented to the Court on multiple occasion, despite the absence of support. NITEL knew – or with reasonable inquiry should have known – that it never had a contract with PNC's predecessors and could not sustain a breach of contract claim against PNC. From a purely evidentiary perspective, NITEL and its attorneys certainly knew they could not prove the existence of a valid contract. Throughout the protracted proceedings, NITEL consistently argued that it was "alleging a contract with PNC," yet it never offered any evidence to support the existence of a contract and, when pressed, could not even describe the alleged contract. As the record on summary judgment confirms, no contract ever existed that could give rise to a breach of contract claim against PNC, National City or Mid-America. This insurmountable proof problem was emphasized to NITEL and its attorneys on multiple occasions, to no effect.

PNC advised NITEL by July 31, 2012 that PNC owed it no contractual obligation. On that day, Jim Crowley, counsel for PNC, wrote to Robert Riffner, counsel for NITEL, and explicitly advised him of this fact [65-1]. Crowley explained that any contractual obligation to pay NITEL came from Nexxtworks. *Id.*, p. 1. Crowley also discussed the evidence that he had uncovered proving that NITEL *knew* its contractual relationship was with Nexxtworks and not the banks (i.e, the proof of claim). Crowley's letter attached the proof of claim. Despite this – and

despite the threat of a sanctions motion – NITEL did not abandon its baseless litigation. NITEL did not respond to the letter and took no steps to withdraw its claim or dismiss the case.

Moreover, NITEL was again confronted with the lack of proof at least two more times: once at the February 28, 2013 hearing on PNC's motion to compel before the Magistrate Judge, and again on April 2, 2013 when Crowley sent the second Rule 11 letter. To the extent Riffner had any doubt about whether his client could pursue a breach of contract claim against PNC based on work orders and an email from Nexxtworks, Magistrate Judge Rowland confirmed that it could not. Despite the admonition from the Magistrate Judge, NITEL did not dismiss its complaint but continued to press its false breach of contract claim.

Crowley's April 2, 2013 letter further bolstered the Magistrate Judge's determination that NITEL's work orders could not form the good faith basis of any contractual obligation on the part of the banks. Crowley explained to Riffner that, to the extent he was relying on the work orders to support his contract claim, that claim would fail. Specifically, he gave Riffner notice of the affidavits PNC obtained from the bank representatives who allegedly signed the work orders where NITEL worked. Those affidavits undermined NITEL's argument that the branch managers somehow authorized the work or obligated PNC to pay NITEL. In the affidavits, the branch managers disavowed any authority to sign such orders and denied ever signing the orders; in fact, the branch managers represented that the signatures on the orders were not theirs, indicating forgery. *See* April 2, 2013 Letter from Crowley

to Riffner [65-5]; Affidavit of Kathleen Petzold [46-29]; Affidavit of Beata Mikita-Glenn [46-31]. Crowley's second letter advised NITEL and Riffner that PNC planned to file a motion for summary judgment. Crowley advised that PNC would also file "a motion for sanctions against your client, as well as your office with respect to this frivolous lawsuit and you, as attorney for NITEL should have either refused to file this lawsuit, or sought settlement once you became aware of the matters which I describe above." [65-5], p.3. Despite the threat of a sanctions motion, and despite being confronted with evidence that undermined any shred of support for a breach of contract claim, NITEL failed to comply with Rule 11. Once again, NITEL did not respond to the letter and took no steps to withdraw its claim or dismiss the case.

To the contrary, despite Crowley's letters and despite the Magistrate Judge's rulings, NITEL persisted in its baseless position before this Court that the work orders and the email from Nexxtworks established a breach of contract claim against PNC. At his deposition, Paul Coy himself claimed under oath that the work orders were "contracts" that PNC breached. Coy Deposition [83], p. 19. Neither Coy, nor NITEL, nor Riffner (who was present at Coy's deposition) ever corrected that false assertion.

The proof of claim constitutes clear evidence that, in fact, NITEL knew Nexxtworks (and not PNC) was contractually obligated to pay for the work NITEL did at the branches, and even a cursory investigation would have shown that the Nexxtworks email and the work orders could not support a breach of contract claim.

At a minimum, Crowley's July 31 letter alerted Riffner to the fatal weaknesses in his client's case. And his continued assertion of the claim thereafter is sanctionable.

Discovery proceedings and Crowley's second letter eliminated any possibility that the work orders could support a breach of contract claim, yet NITEL improperly persisted in its breach of contract claim, forcing PNC to conduct the discovery necessary to support its summary judgment motion. Even on summary judgment, NITEL maintained its claim but offered no evidence to support its arguments on summary judgment, in violation of the Court's Local Rules. Perhaps most damaging to NITEL, PNC submitted the bank managers' affidavits in its summary judgment motion, which indicated that NITEL relied upon fabricated evidence (fake work orders, supposedly signed by branch managers at the banks) in an attempt to bolster its claim – a claim it knew could not survive legally or factually. NITEL did not attempt to explain or refute this evidence in response to the summary judgment motion.

In its response to PNC's motion for sanctions, NITEL fails to justify its behavior under Rule 11. NITEL notes that there is no dispute that it performed work in PNC branches, and thus the work must have been authorized. But no one is suggesting otherwise. The question is not whether NITEL was authorized to perform work at the branches; it clearly was. The question is whether NITEL had any legal right to pursue a breach of contract claim against PNC. The answer to that question is equally clear: it did not. In its Verified Complaint, NITEL alleged that in "August of 2007, NITEL entered into agreements with National City Bank

and Mid-America Bank to install data and telephone cabling at four separate bank locations . . . ." Verified Complaint [46-2], ¶4 (attached as Exhibit B to PNC's State of Facts in Support of Summary Judgment). It further alleged that "National City Bank and Mid-America Bank defaulted on their obligations under the agreement by failing to pay NITEL for the work that it completed at those four locations" and that "PNC is now the successor in interest to both National City Bank and Mid-America Bank and, as such, is solely responsible for the obligations of those entities." *Id.*, ¶¶9-10. Nothing in NITEL's response would allow this Court to conclude that the breach of contract claim filed against PNC, the allegations of which were reiterated throughout these proceedings, was warranted under existing law. Nor has NITEL provided any basis for the Court to conclude that the factual contentions in that claim had evidentiary support.

In fact, as explained above, Paul Coy admitted at his deposition that he did not know (or particular care) whether NITEL had a contract with PNC. When asked why he was seeking payment from Nexxtworks, he testified "[b]ecause we didn't know who the bank had paid. So we were trying to after anybody that had money. We just didn't want to [lose] any opportunities." *Id.*, p. 111, lines 19-21. Coy testified that he really did not know who owed him money – whether it was the banks or Nexxtworks. Coy had no factual basis for his breach of contract claim against PNC, and he knew it. And if his attorney had probed just a little, he would have quickly determined that there was no contract – and therefore no feasible theory of liability – with respect to PNC. Because NITEL and Riffner maintained

the breach of contract claim in the absence of any evidence and in light of Coy's testimony, the Court finds that NITEL (through Coy) and Riffner pursued this claim for an improper purpose: to harass PNC for the purpose of forcing the bank to pay.

For his part, Attorney Riffner argues that he and his firm were essentially hired to be NITEL's debt collector, and that all of the clients responded to his collection efforts by paying on the invoices . . . except PNC. Riffner argues that his client's explanation of the PNC "debt" "seemed imminently reasonable." Response, p.2. Nevertheless, the fact that other clients may have legitimately owed debts to NITEL would not, and did not, obviate the need to conduct due diligence on the PNC debt to ensure it was legitimate. And of course Riffner's statement says nothing about whether the explanation supported a claim against PNC, as opposed to Nexxtworks.

Riffner also notes that, after PNC provided evidence that the branch work orders had been forged, it "did not use the work orders as evidence against PNC's Motion for Summary Judgment." Response, p. 7. This statement is likewise unavailing. The work orders were what NITEL used (without success) to justify its claim against PNC in the first place; acknowledging that those work orders were forged would completely undermine NITEL's claim. Thus, if Riffner is admitting that he recognized at that point that the work orders were fake and that his claim was meritless, he should have taken affirmative steps to correct the matter and dismissed the case. *See, e.g., Fowler v. Freighliner Corp.*, No. 99 C 0988, 1999 WL

1000558, at *3 (N.D. Ill. Nov. 1, 1999) ("Rule 11 imposes a duty to withdraw claims filed without evidentiary support.").  Neither he nor NITEL did that; instead, he and NITEL continued to assert in bad faith under Rule 11 the existence of a contractual obligation on the part of PNC to pay NITEL for the cabling work.  Far from curing the Rule 11 violation, NITEL and Riffner compounded it.

NITEL's and attorney Riffner's failure to investigate the legal and factual bases for the breach of contract claim against PNC is sanctionable, as is the continued assertion of those claims through summary judgment proceedings here. The representations and statements in the complaint, pursued in this Court and repled in response to PNC's motion for summary judgment, were made for an improper purpose – namely to harass PNC and to extort a settlement from PNC when no legal entitlement to damages could be established – and lacked any evidentiary support in the record.  As such, they violate Rule 11.

In sum, the Court finds that NITEL's breach of contract claim, initially pled in state court but maintained in this Court after removal, was frivolous, lacking any basis in existing law.  Additionally, the factual allegation concerning the existence of a valid contract between PNC or its predecessors and NITEL lacked any support in fact or law, as there never was a contract between NITEL and the banks.  Yet NITEL asserted the allegation in its verified complaint, throughout discovery, *see e.g.*, NITEL's response to PNC's motion to compel [27], pp. 1-2, and on summary judgment, *see* NITEL's memorandum in support of its response to PNC's motion for summary judgment [56], pp. 1-3.  These pleadings all run afoul of Rule 11(b)(2) and

(3).   NITEL and counsel's insistence on the existence of a contract despite the lack of evidentiary support, taken together with Coy's deposition testimony, indicate that this case was filed and pursued for an improper purpose – namely, to force PNC to pay up – in violation of Rule 11(b)(1).

Under Rule 11, the Court may impose sanctions on lawyers or parties or both for submissions that are filed for an improper purpose or without a reasonable investigation of the facts and law necessary to support their claims. *See* Fed.R.Civ.P. 11(b).  Additionally, where an attorney and client are both responsible for the conduct that violates Rule 11, the Court may impose joint and several liability. *E.g. Jimenez v. Madison Area Technical College*, 321 F.3d 652, 656 (7th Cir. 2003) (citing *In re Alberto*, 119 B.R. 985, 993 (Bankr. N.D. Ill. 1990) ("[w]hen an attorney and client share responsibility for litigation strategy and such strategy violates Rule 11, courts can impose joint and several liability...").  NITEL (via Paul Coy) initially determined that it would go after PNC to recoup the money it deemed it was owed; Coy signed the verified complaint on behalf of NITEL and represented in the complaint and in his deposition that NITEL had a valid contract with the banks when he knew it did not.  Coy also developed the litigation theory that the work orders could constitute a contract – a frivolous theory that had no basis in law or fact, and he pursued that theory on NITEL's behalf and as NITEL's president. Riffner advanced Coy's theory and NITEL's claim (both in signed pleadings and in arguments before the Court) without reasonable investigation of the surrounding facts and law.  Riffner never withdrew the claim; rather, he continued to oppose

summary judgment even after he realized that the work orders could not support a breach of contract claim. Accordingly, the Court finds that NITEL and Robert G. Riffner[2] are jointly liable for the Rule 11 sanctions.

## C.    Reimbursement of Fees and Costs is the Appropriate Sanction.

Having determined that some sanction is appropriate, the Court next considers the type and amount of the sanction. PNC seeks all of the fees and costs it incurred in this case. Specifically, it claims costs in the amount of $1,702.35 and fees in the amount of $82,622.35 (through March 9, 2015). While Rule 11 "is not a fee shifting measure," an appropriate sanction may include "payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4); *Cooney v. Casady*, 735 F.3d at 523. Under Rule 11, however, the sanction imposed "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." *Id.*

Given that NITEL's claim against PNC lacked any good faith basis from the start, all of the fees and costs incurred by PNC can be viewed as stemming from the Rule 11 violation. Additionally, NITEL and Riffner persisted in refusing to see (or

---

[2]   Robert G. Riffner was potentially affiliated with two firms during the relevant time period. Riffner represents in his response to PNC's sanctions motion that he formed the Riffner Firm, P.C. (where he is the only attorney) in August of 2012. Riffner filed his appearance in this case on May 23, 2012 and, at that time, identified his firm as Riffner Barber LLC. It is this firm -- and not the Riffner Firm -- that appears on all of the relevant pleadings, including the response to PNC's motion to compel filed January 29, 2013 and the summary judgment response brief filed December 11, 2013 – both long after Riffner allegedly switched from Riffner Barber to the Riffner Firm. The Court finds that the murky water surrounding this issue constitutes "exceptional circumstances" under Rule 11(c)(1) and, accordingly, declines to hold Riffner Barber (which consists of just one additional lawyer) or the Riffner Firm liable for Riffner's personal and professional failings.

declining to act upon) what was in front of them the entire time, that is, there was no contract between NITEL and PNC. At various points in this litigation, NITEL and its counsel were directly confronted with the frivolous nature of this lawsuit. Yet at no point did NITEL withdraw its claim or back off in any way on its pursuit of its claim. Even on summary judgment, NITEL pressed the breach of contract claim, despite a complete lack of evidence to support it. Neither NITEL nor Riffner has ever taken any affirmative step to correct or withdraw the false statements, allegations and pleadings presented here. Such conduct suggests that a significant sanction is necessary to achieve the desired deterrent effect. Additionally, although the Court is not specifically sanctioning Riffner for his most recent failures to comply with the Orders issued in connection with the sanctions motion (e.g. his failure to appear and file briefs as directed), this conduct confirms that a substantial sanction is required to convey the message that compliance with federal rules and orders is not optional. Accordingly, the Court finds that the sanction urged by PNC is necessary for effective deterrence, and the Court will impose a sanction in the amount requested.

## CONCLUSION

For the reasons explained above, the Court finds that Rule 11 sanctions are warranted against NITEL and its attorney, Robert G. Riffner. The Court further finds that the appropriate sanction is $84,324.70, the amount of attorneys' fees and costs PNC incurred in having to defend against NITEL's claim, which was baseless from the start.

The sanction is imposed against NITEL and Robert G. Riffner jointly and severally, and should be paid directly to PNC, via its counsel, James M. Crowley of Crowley & Lamb, P.C.

Dated: April 29, 2015

Entered:

John Robert Blakey
United States District Judge